IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| MARY JUERGENS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case Number: 06-CA-1524 |
| | ) | |
| URBAN TITLE SERVICES, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF JUERGENS'S F. R. CIV. P. 26 (a) (2) (B) EXPERT DISCLOSURE OF GARY W. SCHILLER, MORTGAGE BROKER

Pursuant to Rule Rule 26 (a) (2) (B) of the Federal Rules of Civil Procedure and for the reasons that follow, Plaintiff Mary Juergens, by and through her attorneys, J.P. Szymkowicz, John T. Szymkowicz and the Law Firm of Szymkowicz & Szymkowicz, LLP, submits the following expert disclosure of Gary W. Schiller, 5640 Nicholson Lane, Suite 210, Rockville, Maryland 20852 who Plaintiff Juergens plans to call as an expert witness at trial in the field of mortgage lending:

### Educational Background

C.W. Post College, Greenvale, New York, Bachelor of Science, Business Administration, 1973

Continuing Education:

Florida – 2008 – "Essentials of Florida Mortgage Education"

West Virginia – 2007 – "Ethical Mortgage Practices"

Maryland – 2005 - "Federal Law, Maryland Law, Ethical and Legal Implications of Predatory Lending"

## Employment History

| | |
|---|---|
| June 1983 – Present | BMIC Mortgage, Inc. (formerly FWB Mortgage, Inc.)<br>5640 Nicholson Lane, Suite 210, Rockville, MD. 20852<br><br>I am currently employed as President of BMIC Mortgage |
| June 1983-November 1985 | Epic Mortgage, Inc.<br>5500 Leesburg Pike<br>Falls Church, VA.<br><br>I was employed as vice-president of builder services. |
| June 1982 – June 1983 | Bankers Finance Corporation<br>Arlington, VA<br><br>I was employed as vice-president of investments. |
| September 1977 – June 1982 | The National Bank of Washington<br>619 -14th Street, Washington, DC<br><br>I was employed as vice-president of real estate. |
| May 1973 to September 1977<br>4 New York Plaza, New York, N.Y. | Manufacturer Hanover Corp.<br><br>First Virginia Bankshares<br>6400 Arlington Blvd., Falls Church, VA.<br><br>I was employed as a corporate auditor. |

## Licenses Held

Individual Mortgage Broker Licenses
Mortgage Originator – State of Florida – CL-0700832 – Expires 08/31/08
Mortgage Originator – State of W. Virginia – LO-10504 – Expires June 30, 2010

2

## Disciplinary Actions

None

## Professional Associations

National Association of Mortgage Brokers
Maryland Association of Mortgage Brokers

## List of Publications

None

## Previous Expert Testimony

I have previously testified as an expert at trial or in deposition in the following cases:

1. Prince Georges County Circuit, as expert for law firm, (whose name I can't recall) representing a developer against an engineering firm.

I have previously provided expert reports (but did not testify as an expert at trial or in deposition) in the following cases:

1. For the Law firm of Williams & Connelly, representing Capital Bank. The case was settled prior to my court testimony being required.

2. For the law firm of Pasternack & Fidis representing a Loan Servicing Company. This case was settled prior to my court testimony being required.

## Information Considered in Forming Opinions

I am submitting this report based on my education and training in the field of mortgage lending. The data and other information considered by me in forming my opinions expressed herein were the following:

a. My review of Plaintiff Juergens' 3rd Amended Complaint;

3

b.   My knowledge, education, training and experience in the field of mortgage lending and

d.   My review of the following 73 exhibits introduced during the depositions of Robert William Carney, William Kenney, Paul Erb, Arthur Bennett, Dale Duncan and Martin Mooradian in the above-referenced case as well as the transcripts of these depositions:"

1.   Notice of Mary Juergens' Deposition
2.   FMV Uniform Residential Loan Application dated 8/30/05
3.   FMV Borrower Affidavit
4.   Letter from John DiNucci to Kalbian Hagerty dated 9/17/04
5.   UT Uniform Residential Loan Application dated 8/15/03
6.   Notice of Foreclosure Sale of Condominium Unit for Assessments Due dated 9/9/03
7.   UT Note dated 10/20/03
8.   UT HUD-1 dated 10/20/03
8a.  UT HUD-1 dated 10/20/03 - version with Mr. Erb's Handwriting
9.   UT Deed of Trust dated 10/20/03
10.  IRS Certificate of Release dated 3/10/04 in amount of $716.13
11.  IRS Certificate of Release dated 3/10/04 in amount of $5,363.45
12.  Mary Juergens' Credit Report dated 7/15/03
13.  Letter from Paul Erb to Mary Juergens dated 3/9/04
14.  Letter from Nicole Brown to Mary Juergens dated 11/21/05 plus attached letter dated 10/24/03 from Kass Mitak to 1230 23rd Street Condominium Association (with attached check dated 10/21/03 in amount of $8,563.22 paid to 1230 23rd Street Condominium Association and attached check dated 3/9/04 paid to 1230 23rd Street Condominium Association in amount of $1,592.58).
15.  Good Faith Estimate - Atlantic Capital (with multiple attached disclosures)
16.  UT Deed of Trust dated 10/20/03 (this is the same as Exhibit 9).
17.  Letter from John DiNucci to Robert Carney dated 5/25/04
18.  Mary Juergens' Credit Report dated 8/31/05
19.  Letter from Kalbian Hagerty to John DiNucci dated 6/29/04
20.  Fax from John DiNucci to Paul Erb dated 6/2/04
21.  Mary Juergens' Response to Defendants' Joint Interrogatories and Requests for Production of Documents
22.  Mary Juergens' Original Complaint
23.  Mary Juergens' 1st Amended Complaint (to correct misnomer of Urban Title).
24.  Mary Juergens' 2nd Amended Complaint
25.  Order of Judgment in State Farm v. Juergens dated 7/14/04
26.  Letter from George Owen to Dale Duncan dated 8/5/05
27.  Letter from Mary Juergens to First Mount Vernon dated 8/4/05
28.  Check from First Mount Vernon to Mary Juergens in amount of $96,000.00 dated 8/31/05

4

29.   Check from Brickshire to George Owen in amount of $61,195.11 dated 9/1/05
30.   FMV HUD-1 dated 8/31/05
30a.  FMV HUD-1 dated 8/31/05 provided by Brickshire during the deposition of Brickshire's corporate designee
31.   FMV Balloon Deed of Trust Note dated 8/31/05
32.   Letter from FMV to Mary dated 9/7/06
33.   FMV - Commercial Loan Balloon Deed of Trust Note dated 8/31/05
34.   FMV Deed dated 8/31/05
35.   FMV Mortgage Reverification Agreement dated 8/31/05
36.   FMV Financing Agreement dated 8/31/05
37.   FMV Document Correction Certification dated 8/31/05
38.   FMV Assignment of Contracts, Income, Leases, Rents and Profits dated 8/31/05
39.   1230 23rd Street, LLC Operating Agreement dated 8/31/05
40.   Resolution to Borrow from a Designated Bank
41.   FMV Assignment of Contracts, Income, Leases, Rents and Profits dated 8/31/05
42.   FMV Deed in Lieu of Foreclosure dated 8/31/05
43.   Letter from First Mount Vernon to Mary Juergens dated 12/1/06
44.   Envelope from Frist Mount Vernon to Mary Juergens (with handwritten notation from Mary Juergens' mother) with postmark dated 12/8/07
45.   FMV Loan Payoff Statements (multiple statements)
46.   FMV Checks to FMV (multiple checks)
47.   Letter from FMV to Mary Juergens dated 11/15/05
48.   Letter from FMV to Mary Juergens dated 11/3/05
49.   Mary's Passport
50.   Mary's signature on blank page above her name
51.   Mary's signature on a blank page
52.   Mary's Affidavit in reply to Defendants' Summary Judgment Motion
53.   Two pages from Letter from Mary Juergens to First Mount Vernon dated 8/4/05
54.   Pay-off Note - Owen Trust
55.   Satisfaction of George Owen Trust
56.   Letter from Brickshire to D.C. Real Property Tax dated 9/3/05
57.   D.C. Recorder of Deeds receipt dated 9/21/06 in the amount of $5,934.50
58.   Letter dated 9/5/01 signed by Douglas Yearley, Mary Juergens and Alyson Gannon regarding title ownership of condo
59.   Notice of Intent to Accelerate Installments and File Lien from the 1230 23rd Street Condominium Association dated 5/7/08
60.   Deed dated 9/21/01 from Alyson Gannon to Mary
61.   Mary's Affidavit in Support of her Motion for Partial Summary Judgment
62.   1230 23rd Street LLC's Articles of Organization
63.   Disbursement Sheet provided by Mr. Erb during his deposition
64.   Disbursement Sheet provided by Brickshire during its deposition

65. Appraisal re: FMV Loan
66 Check dated 8/18/05 from "The Beacon Group" to Virginia State Corporation Commission re: "1230 23rd Street, LLC"
67. Check dated 8/31/06 from FMV ILA to Virginia State Corporation Commission re: "1230 23rd Street, LLC"
68. Check dated 2/28/08 from FMV ILA to Virginia State Corporation Commission re: "1230 23rd Street, LLC"
69. Certification of Maryland Secretary of State re: Dale Duncan's Notary License
70. Presidential Savings Bank Wire Disbursal dated 8/31/05 in the amount of $73,718.69 re: FMV loan
71. Chevy Chase Bank receipt dated 7/7/08 re: Mary Juergens' Safe Deposit Box
72. Letter from Virginia Secretary of the Commonwealth re: Dale Duncan's Notary License
73. FMV's Accounting of Payments made on Mary Juergens' FMV loan

## Opinions and Conclusions and Bases and Reasons for Opinions and Conclusions

**I. The following section contains my general opinions and conclusions and bases and reasons for my general opinions and conclusions regarding the loan involving Urban Title Services, Inc. and George Owen:**

History:

During October 2003, Ms. Juergens made an application to UTS for a $60,000.00 residential refinance loan on her property located at 1230 23rd Street NW, Unit 505, Washington, DC. The proceeds of this loan were going to be used to payoff delinquent condominium fees and associated penalties, payoff various collection accounts, provide cash out to Juergens, and to provide funds to pay reasonable settlement fees. On or about October 8, 2003, UTS submitted the Ms. Juergens loan package to Atlantic Funding Capital Corporation for loan approval. Atlantic Funding Capital Corporation declined the loan, and returned the loan package to UTS. UTS resubmitted the loan package to representatives of the George Owen Trust, who agreed to make the loan. The real estate loan to Ms. Juergens closed on October 20, 2003. UTS acted as the settlement agent.

Conclusion:

Based on the documentation that I have seen in this file, I believe UTS acted as a mortgage loan broker in this residential refinance transaction. Accordingly, UTS had an obligation to disclose to Juergens his relationship to the parties in this transaction, who he represents, and the form and amount of compensation that he receives. Also, UTS had a responsibility to provide Ms. Juergens with the requisite District of Columbia and Federal disclosures in association with this residential owner occupied financing, but did not do so.

6

As a mortgage loan broker, UTS had the obligation to Juergens to only originate a loan that she could repay. Although Ms. Juergens stated that she had the necessary income to make the monthly payments, repayment of the balloon payment due on October 20, 2004 was unlikely. The only way that the balloon payment could be repaid was by refinance, and based on Juergens credit report, and the recent declination of the original loan request from Atlantic Funding Capital Corporation, UTS had to know that repayment of the balloon payment was unlikely.

I also examined the HUD-1 related to the George Owen loan and provided the information relating to the industry's customary and reasonable fess as shown in paragraphs 43-56 in the 3rd Amended Complaint.

Therefore, based on these numbers I believe that UTS overcharged Ms. Juergens by $4,623.45.

I have reviewed each and every allegation contained in the "Counts" section contained in Ms. Juergens 3rd Amended Complaint and I concur with each of the statements contained therein for the reasons stated in my expert report.

II.    **The following section of this report highlights specific actions that each individual Defendant took that caused or contributed to Ms. Juergens' damages:**

<u>Mr. Kenney</u>:    I believe that the evidence proves that Mr. Kenney acted as a mortgage broker as defined by District of Columbia law based upon Mr. Carney's testimony that Mr. Kenney brought him the Juergens loan as referenced in Paragraphs 24-25. If Mr. Kenney did not have a mortgage broker license in Washington, DC, he is in violation of D.C. law. As the settlement agent, Mr. Kenny also had the duty to promptly return escrowed loan proceeds to Ms. Juergens if he did not use these proceeds to pay off debts and failed to do this. This is even more egregious since Mr. Kenney had actual knowledge that Ms. Juergens wanted this money back. I further believe that as a mortgage broker, Mr. Kenney had the duty to decline to obtain Ms. Juergens a mortgage loan in the amount of $60,000.00 in October 2003 since there was no evidence to support a belief that Ms. Juergens could repay a loan with terms as stated in the George Owen loan based upon her declared income and assets. While Ms. Juergens could pay her monthly payments, there was no way that she could pay the principal back at the end of the term.

<u>Mr. Erb</u>: Mr. Erb committed improper notarizations and authentications on the George Owen loan paperwork since he was not in a position where he could see Ms. Juergens sign the documents or where he could ask her questions in order to take a proper acknowledgement. It also appears that like Mr. Kenney, Mr. Erb had a duty to promptly return escrowed loan proceeds to Ms. Juergens if he did not use these proceeds to pay off debts and failed to do this.

<u>Urban Title Services, Inc.</u>:    I believe that under an agency theory, Defendant Urban Title Services, Inc. is responsible for the actions of their agents or employees, Mr. Kenney and Mr. Erb and was negligent for failing to supervise these individuals.

**III.    The following section contains my general opinions and conclusions and bases and reasons for my general opinions and conclusions regarding the loan involving First Mount Vernon ILA:**

History:

On or about August 4, 2005, Ms. Juergens made an application to Mr. Bennett in connection with a loan from either First Mount Vernon Industrial Loan Association, Inc. or its affiliate, First Mount Vernon Mortgage, LLC, for a residential refinance loan on her property located at 1230 23rd Street NW, Unit 505, Washington, DC. The proceeds of this loan were going to be used to payoff the existing first mortgage to George Owen in the amount of $60,000.00, which was in default, to pay any other outstanding liens, including real estate taxes, condo fees, to provide funds to pay reasonable settlement fees, and to provide cash out to Ms. Juergens. On August 4, 2005, Mr. Bennett accepted Ms. Juergens' loan application and ordered a credit report. At some time after August 4, 2005, Mr. Bennett made the decision that First Mount Vernon Mortgage, LLC was unable to make a residential loan.

At some time after August 4, 2005, after Mr. Bennett decided that First Mount Vernon Mortgage, LLC would not make a residential loan to Ms. Juergens, Mr. Bennett agreed to make a commercial loan to Ms. Juergens from First Mount Vernon Industrial Loan Association, Inc. in the amount of $250,000.00 if she established an LLC to take title Ms. Juergens' condominium unit. First Mount Vernon ILA would then loan the money to the LLC. The sole principal of this LLC, was Ms. Juergens. The sole asset that the LLC owned was the real estate located at 1230 23 Street NW, Unit 505, Washington, DC. The terms of the loan were as follows:

| | |
|---|---|
| Loan Amount: | $ 250,000.00 |
| Interest Rate | 18.00% |
| Term: | Due on or before September 01, 2007 |
| Monthly Payments: | Interest only of $3,750.00 per month until maturity |

The proceeds of the $250,000.00 were used as follows:

| | |
|---|---|
| Payoff of Existing 1st Mortgage | $ 61,195.11 |
| Pay DC 1st half Real Estate Tax | 3,352.90 |
| Loan Origination Fee to Lender | 10,000.00 |
| Fees for additional Lender charges | 1,660.00 |

| | |
|---|---:|
| Closing Fees paid to Lenders Attorney | 2,095.00 |
| Set up Interest Reserve to Lender | 60,996.04 |
| Prepaid Interest | 100.00 |
| Transfer fees to DC to transfer property from Ms. Juergens, Individually toBorrower | 5,500.00 |
| Other recording fees | 247.50 |
| Lender's Title insurance | 1,743.75 |
| Other Settlement company charges | 1,778.50 |
| Proceeds to Borrower | 95,000.00 |
| Unexplained Difference – Transferred to Interest Reserve | <u>6,331.20</u> |
| TOTAL | $250,000.00 |

Conclusion:

1.    Based on the documentation that I have seen in this file, I believe that Ms. Juergens originally went to First Mount Vernon (whether the ILA side or the mortgage side cannot be determined at this time) on or about August 4, 2005 to seek a residential refinance loan. My conclusions are based on :

a.    Mr. Bennett's admission on page 43 of his deposition that had Ms. Juergens had 6 months of good mortgage payment history, he would have been able to provide her with a mortgage loan thru First Mt. Vernon Mortgage, his mortgage brokerage affiliate. Further, Mr. Bennett claims that after 6 months of current mortgage payments, which were paid from the LLC to First Mount Vernon ILA, that Ms. Juergens would be able to refinance thru First Mt. Vernon Mortgage, his mortgage brokerage affiliate, Since First Mt. Vernon Mortgage only does residential loans, it is obvious that Mr. Bennett knew that Ms. Juergens occupied the property located at 1230 23rd Street NW, Unit 505, Washington, DC., at the time of loan application.

b.    By requesting a residential loan, Ms. Juergens would have been able to reduce her borrowing request by at least $72,827.24 because she would not have to pay transfer fees, and she could not be required to set up an interest reserve account under D.C. law.

c.    By requesting a residential loan Ms. Juergens would have been able to get more favorable terms including a more favorable interest rate, and a possibly a longer loan term , but for the fact that Ms. Juergens' negative credit history did not permit First Mount Vernon ILA to extend any loan to Ms. Juergens without violating D.C. law since there was no reasonable way for Ms. Juergens to payoff this loan on the maturity date.

d. The transfer of personal real estate to an LLC is a sophisticated transaction. There are significant tax and legal issues to be considered. Based on the documentation that I've seen in the file, Ms. Juergens did not have the financial savvy to know about the various benefits or problems with LLCs.

2. Mr. Bennett ordered a credit report on August 4, 2008. Although that credit report was not made available to me it is my belief that based on his review of the credit report, Mr. Bennett realized that Ms. Juergens would not qualify for a residential owner occupied loan. Mr. Bennett also knew that Ms. Juergens was living at 1230 23rd Street NW, Unit 505, Washington, DC at the time that the application was submitted. On page 26 of his deposition Mr. Bennett claims that Ms. Juergens expected to receive $1,650.00 as anticipated rental income from the property. Mr. Bennett claims that Ms. Juergens stated her desire to vacate the property and rent the premises, but admitted that she had not done so by the time of the closing on the loan. Therefore, at the time of application Mr. Bennett was aware that Ms. Juergens was applying for a residential owner occupied loan.

3. During the application process, Mr. Bennett ordered an appraisal of the property from his real estate appraiser. The appraisal, which is done solely for First Mount Vernon's benefit, and is First Mount Vernon's sole property, is dated September 08, 2005, (after the closing between Ms. Juergens and First Mount Vernon), shows that Ms. Juergens is the owner occupied resident of the property.

Based on the information listed above, I conclude that the loan referenced above between the 1230 23rd Street, LLC. and First Mount Vernon ILA was really in fact a residential owner occupied mortgage loan between Ms. Juergens and First Mount Vernon ILA. Since this was a residential mortgage loan I believe that the loan is subject to all federal and state mortgage laws, and disclosure requirements (which were not disclosed as required). Based on my review I believe that the Lender violated numerous Federal and State usury laws, that they violated many provisions (of)RESPA, and that they violated Regulation Z – Truth in Lending Act. In fact, my calculation of the annual percentage rate on Defendant First Mount Vernon ILA's loan to Ms. Juergens is 42.239%. I therefore concur with the statement in Ms. Juergens' 3rd amended complaint: "Defendant First Mount Vernon ILA fraudulently disguised the loan to Plaintiff Juergens as a commercial loan rather than, what was in reality, a personal consumer residential loan in order to charge Plaintiff Juergens a higher rate of interest and to circumvent District of Columbia mortgage, consumer and fair lending laws."

I have reviewed each and every allegation contained in the "Counts" section contained in Ms. Juergens 3rd Amended Complaint and I concur with each of the statements contained therein for the reasons stated in my expert report.

IV. **The following section of this report highlights specific actions that each individual Defendant took that caused or contributed to Ms. Juergens' damages:**

<u>Mr. Bennett</u>: I believe that Mr. Bennett operated in bad faith as a loan officer on Ms. Juergens' loan. The evidence for this opinion is very simple. I believe that Mr. Bennett's first contact with Ms. Juergens was by telephone on August 4, 2005. I believe that the evidence supports this because her credit report shows an inquiry from First Mount Vernon on that date. Based upon this extremely negative credit report and unverifiable assets and income, as well as upon the fact that the $60,000.00 George Owen loan was in default, there was no way for any responsible lender to justify extending a loan in any amount sufficient to payoff the George Owen loan. The prudent and responsible thing for Mr. Bennett to have done was to decline Ms. Juergens' loan request, which, while it may have had the effect of sending Ms. Juergens into foreclosure, would have at least allowed her to retain some proceeds of the foreclosure sale price since the foreclosure sale should have provided funds beyond that owed to Mr. Owen. Instead, Mr. Bennett disguised what is obviously a residential loan as a consumer loan. I believe that the evidence suggests that Mr. Bennett structured this loan as a commercial loan in an effort to avoid fair lending and usury laws, and when (not if) Ms. Juergens defaults on her loan, sell, or bid and resell, her property in a foreclosure sale since with a loan balance of approximately $250,000 and a value of $490,000, there were enough fees related to the default and foreclosure to allow First Mount Vernon to sell, or bid and resell the home with nominal, if any, excess sale proceeds to return to Ms. Juergens as there would have been if Mr. Owen had foreclosed upon his $60,000.00 loan.)

I further believe that Mr. Bennett did not act as any prudent lender would with regard to examining the HUD-1 prior to closing. Had Mr. Bennett examined the HUD-1 prior to closing, he would have found numerous discrepancies and confusing entries, which would have justified stopping the loan process until the HUD-1 clearly accounts for all entries. I also believe that Mr. Bennett's advice for Plaintiff Juergens to "sell" her property to an LLC was a further attempt to circumvent fair lending laws by creating a false appearance that the loan is a commercial loan exempt from certain laws. Finally, even if Ms. Juergens lied about where she lived, Mr. Bennett had the duty to verify Ms. Juergens statements, especially since her credit report clearly states "address discrepancy" and her appraisal clearly states "owner-occupied." Mr. Bennett even admitted during his deposition that Ms. Juergens had not yet moved out of her home and had not yet rented the property out. Therefore, at the time of the loan closing, Ms. Juergens' loan was clearly a residential and not a commercial loan.

<u>Mr. Duncan</u>:    I believe that Mr. Duncan owed Ms. Juergens a fiduciary duty with regard to the establishment of the LLC. If we take Mr. Duncan's statement that Ms. Juergens wanted to place the condominium in a corporation as true, the next question that Mr. Duncan (as a lawyer) should have asked is – Why?  The answer is clear – there was very little benefit (if at all) for Ms. Juergens to place the property in a corporation or an LLC. Mr. Duncan admits that he did not

11

have more than a cursory discussion about the benefits of an LLC holding title to the property. I believe that Mr. Duncan was negligent in advising Ms. Juergens to establish an LLC in this case since this scheme forced her to pay recordation and transfer taxes that she would not have had to pay had she simply kept the property in her own name and rented it out. Also, Mr. Duncan certainly had the duty to domesticate this LLC in the District of Columbia and obtain a business license and authorization to rent the property if he established the LLC as these are necessary steps to follow after the establishment of the LLC in Virginia. This leads to the next question – Why establish the LLC in Virginia when the property is located in Washington? (By registering in Virginia, the LLC would be subject to two jurisdictions' corporate laws and taxes with little (if any) benefit to the LLC's member.)

In Mr. Duncan's capacity as the settlement agent, I believe that he also breached various fiduciary duties to Ms. Juergens. First, he claims that he witnessed Ms. Juergens execute the deed from herself to the LLC. He then closes a loan to the LLC that is apparently unrelated to the transfer of title. This is preposterous as the HUD-1 for the loan clearly shows that there is some type of (albeit confusing and incomplete) sale going on as witnessed by the fact that there is a box for a seller (Ms. Juergens). If this were a simple refinancing as Mr. Duncan claims, there would be no seller. There are also entries for transfer and recordation taxes. This is not related to a refinance since such entries are not required on simple refinance loans. The fact that Mr. Duncan does not know what HUD-1 was used in the transaction is also important when discussing his utter incompetence as a settlement agent. Various laws require that settlement agents keep accurate copies of all documents related to the closing, especially the HUD-1.

While Mr. Duncan claims that this transaction related to a commercial loan, the evidence says otherwise. For example, the HUD-1 itself recites that Ms. Juergens' address was her condominium. He also knew that Ms. Juergens needed to payoff a residential loan from Mr. Owen and that she had no proof of an address other than the condominium. Therefore, Mr. Duncan knew or should have known that this was a disguised residential loan. In addition, Mr. Duncan's claim that he thought that he was a licensed notary is ludicrous since becoming a notary is not just a mere formality or occurs through simply filing papers and paying a fee. Becoming a notary involves, obviously, filing papers and paying a fee, but also waiting to see if the State approves the application and then, if approved, retrieving the license at the local Courthouse. After the license is obtained, the notary must obtain a seal or stamp. Mr. Duncan knew or should have known this as a member of the Virginia State Bar and former notary in Maryland. Therefore, I cannot simply believe Mr. Duncan's claim of negligence on this issue.) Mr. Duncan also claimed that if he did not perform the notarization that some other notary would have. Mr. Duncan's defective notarizations violate both D.C. and Virginia laws and invalidate the documents notarized.

**First Mount Vernon Industrial Loan Association Incorporated**: I believe that First Mount Vernon is liable for the actions of both Mr. Bennett and Mr. Duncan under an agency theory.

**Brickshire Settlements, LLC**:   I believe that Brickshire is liable for the actions of Mr. Duncan (with respect to his role as settlement agent only) under an agency theory. I believe that the lack of a notarial stamp or seal on the documents should have given Brickshire reason to challenge Mr. Duncan's claim that he was a licensed notary. In addition, there is no justification for the incompetence and negligence of Brickshire's office staff (other than Mr. Duncan) to allow an incomplete and confusing HUD-1 such as the one used in the Juergens loan to be presented to a borrow. Similarly, Brickshire is clearly negligent for its loss of the Juergens file after the closing on the loan and associated failures to promptly record documents with the Recorder of Deeds.

### Compensation for Study and Testimony

My billing rate for the preparation of my expert report and disclosure, including the time I spent preparing my expert report and disclosure, reviewing Plaintiff Juergens' 3rd Amended Complaint, deposition transcripts and exhibits is $300.00 per hour. To date, I have spent 33 1/2 hours on these tasks. I have received $10,000.00 in advance for the services that have been and will be performed in connection with my expert report and disclosure and in connection with the time spent preparing for trial and actually appearing at trial to testify as an expert.

My billing rate for appearance at depositions and trial is $300.00 per hour. I begin charging when I leave my home or office and end when I return to my home or office.

**Date and Signature**

Dated: August 1, 2008

_____
Gary W. Schiller

13