UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREA SLOAN, as Guardian and Conservator on behalf of Mary Juergens, an Incapacitated Individual, in both Mary Juergens' individual capacity and as the sole member of "1230 23rd Street, LLC," <br><br> Plaintiff, <br><br> v. <br><br> URBAN TITLE SERVICES, INC., *et al.*, <br><br> Defendants. | Civil Action No. 06-1524 (CKK) |

MEMORANDUM OPINION
(September 14, 2009)

The above-captioned lawsuit was filed by the original Plaintiff in this matter, Mary Juergens,[1] nearly three years ago to challenge the legality of two disparate loans extended to Plaintiff, each of which was secured by a condominium located at 1230 23rd Street, N.W., Apartment 505, Washington, D.C. 20037 (the "Condo"). Plaintiff named as Defendants in this action Urban Title Services, Inc. ("UTS"), Dale Duncan, First Mount Vernon Industrial Loan Association, Inc., Arthur Bennett, and Brickshire Settlements, LLC.[2] According to Plaintiff, the

---

[1] Subsequent to filing the instant action, Ms. Juergens was found to be an "incapacitated individual," and Andrea Sloan was appointed as Guardian and Conservator on behalf of Ms. Juergens and has been substituted as Plaintiff for Ms. Juergens, in both her individual capacity and in her capacity as the sole member of 1230 23rd Street, LLC. *See* Docket No. [114] at 2; *see also* Fourth Am. Compl., Docket No. [120]. For convenience, the Court shall refer to Ms. Juergens and Ms. Sloan interchangeably as "Plaintiff."

[2] Plaintiff also originally named as Defendants in this matter First Mount Vernon Mortgage, L.L.C. ("FMVLLC"), as well as individuals William Kenney, Robert William Carney, and Paul Erb. Plaintiff's claims against Defendant FMVLLC were dismissed by this Court in a Memorandum Opinion and Order dated February 4, 2008, *Juergens v. Urban Title Servs.*, 533 F.

first of the two loans at issue in this case was extended with the assistance of UTS, while the second loan was extended by First Mount Vernon Industrial Loan Association, Inc., with the assistance of Bennett, Duncan and Brickshire (collectively, "FMV Defendants").

Currently pending before the Court are a series of cross-motions for partial summary judgment filed by the various parties in this action. This Memorandum Opinion addresses only those motions for partial summary judgment filed by Plaintiff with respect to allegations in her Fourth Amended Complaint relating to the first loan—*i.e.*, the loan extended with the assistance of UTS—and Defendant UTS' related cross-motion for partial summary judgment. There are three such motions: (1) Plaintiff's [156] Motion for Summary Judgment on the Issue of UTS's Conversion, (2) Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10), and (3) Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI. The first motion relates to Count II of Plaintiff's Fourth Amended Complaint while the latter two motions relate to Counts X and XI of Plaintiff's Fourth Amended Complaint.

Upon a searching review of the memoranda filed with respect to the pending motions, the exhibits thereto, the relevant case law and statutes, and the entire record herein, the Court shall DENY the parties' pending motions for the reasons set forth below. Specifically, the Court: (1) DENIES as moot Plaintiff's [156] Motion for Summary Judgment on the Issue of UTS'

---

Supp. 2d 64, 75 (D.D.C. 2008), and Plaintiff's claims against the individual Defendants Kenney, Carney, and Erb have been voluntarily dismissed by Plaintiff, *see* Jt. Stip. Regarding Dismissal of Defendants William Kenney and Paul Erb, Docket No. [112] and Stip. of Dismissal, Docket No. [113] (dismissing without prejudice any and all claims asserted against Defendants Kenney and Erb individually); *see also* Notice and Stip. of Vol. Dismissal, Docket No. [116] (dismissing any and all claims asserted against Defendant Carney).

Conversion in light of the parties' joint stipulation and UTS' concession of liability; (2) DENIES Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10) and Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI, insofar as it moves for summary judgment on the issue of UTS' status as a statutory mortgage broker, based upon the existence of disputes of material fact; (3) DENIES as moot Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI, insofar as it moves for summary judgment with respect to Count XI, in light of Plaintiff's stipulation of dismissal; and (4) DENIES Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI, insofar as it moves for summary judgment with respect to Count X, based upon the existence of material disputed facts.

## I.  BACKGROUND

The Court assumes familiarity with the factual background of this case, which is set forth in detail in both its May 25, 2007 Memorandum Opinion, *see generally Juergens v. UTS*, 246 F.R.D. 4 (D.D.C. 2007), and its February 4, 2008, Memorandum Opinion, *see generally Juergens v, UTS*, 533 F. Supp. 2d 64 (D.D.C. 2008), and therefore discusses only those facts that are relevant to the motions at issue in the instant Memorandum Opinion. In particular, although Plaintiff's Fourth Amended Complaint includes a variety of allegations regarding the loan extended to her by the FMV Defendants, the Court does not address herein the facts relevant to that loan because Plaintiff's claims as to the FMV Defendants are irrelevant to the motions at issue in this Opinion.

 *A.* *Factual Background*

In or around 2001, Plaintiff obtained a condominium unit located at 1230 23rd Street,

N.W., Washington, D.C., (the "Condo"). Def.'s UTS' Stmt., Docket No. [170], ¶ 10. The Condo was purchased for Plaintiff as a gift from her benefactor, Douglas Yearley. *Id.* Plaintiff, however, was responsible for paying the monthly residential assessments to the condominium association. *Id.* Notwithstanding this arrangement, Plaintiff failed to make the required monthly payments and, by late summer/early fall of 2003, Plaintiff owed approximately $10,000 in condominium assessment fees and related payments. *Id.* ¶¶ 12, 14. The condominium association threatened to foreclose on Plaintiff's Condo. *Id.* ¶ 12. Accordingly, Plaintiff decided to secure a loan to cover her delinquent condominium fees and to avoid foreclosure. *See id.* ¶¶ 13-16.

At that time, Plaintiff owned the Condo free and clear of any mortgages or liens, save for the delinquent condominium assessment and associated fees and penalties. *Id.* ¶ 15. She was also receiving $5,500 in income per month from Yearley. *Id.* ¶ 16. Nonetheless, Plaintiff's credit prevented her from obtaining a mortgage loan from any commercial bank. *Id.* ¶¶ 17-18. Although many of the remaining facts surrounding Plaintiff's attempts to secure a mortgage loan are in dispute, the parties agree that Plaintiff ultimately secured a mortgage loan for $60,000 from a private lender, the Owen Living Trust, and that UTS acted as the closing agent for this loan. *Id.* ¶¶ 29-31. The parties disagree, however, as to whether UTS—in addition to acting as the settlement agent—also played a role in soliciting the mortgage loan on Plaintiff's behalf.

UTS is a settlement company whose services include performing real estate closings and related services. *Id.* ¶ 1. Neither UTS nor any of its agents, servants, or employees possess a mortgage lender or mortgage broker license. *Id.* ¶ 2. William Kenney, Paul Erb and Robert

Carney[3] were owners of and partners in UTS. *Id.* ¶ 3. Within UTS, Kenney's duties included marketings and closings; Erb handled the company's accounting and prepared the HUD-1 Settlement Statements; and Carney supervised Erb, provided legal advice, and prepared title insurance binders. *Id.* ¶ 4. In addition, the parties agree that, separate from his work with UTS, Carney had an outside, unrelated law practice. *Id.* ¶ 5. As part of that law practice, Carney provided legal services to various private lenders, and he would call on these clients from time to time to make loans to individuals such as Plaintiff. *Id.* ¶ 7. One such client was George Owen, who made private loans to individuals through his trust, the Owen Living Trust, a private, non-federally regulated lender. *See id.* ¶¶ 8-9.

As previously explained, Plaintiff met with several local banks in late summer/early fall of 2003, but was unable to obtain a mortgage loan from any of these banks because of her poor credit. *Id.* ¶ 18. Accordingly, in an effort to secure a loan through alternative routes, Plaintiff met with Robert Brickman, a loan officer at Atlantic Capital Funding Corporation ("Atlantic Capital"). *Id.* ¶ 20. Although neither Plaintiff nor UTS has explicitly explained how Plaintiff was first introduced to Brickman, it appears from the record that Plaintiff was first referred to Atlantic Capital by Kenney—in other words, that Plaintiff met first with Kenney at UTS who then referred her to Brickman to assist her with locating a mortgage loan. *See* Pl.'s Resp. ¶ 5, Docket No. [190], (quoting Juergens Deposition at pp. 241:12-242:17 ("[Brickman] was an associate of [Kenney's] and was in that - the same kind of business and was trying to help. I don't know what his company was, but he was someone that Mr. Kenney worked with and was

---

[3] As explained above, Kenney, Erb and Carney were originally named by Plaintiff as individual defendants, but have since been dismissed from this action. *See supra* p.1, n. 2.

trying to help me get a loan.")); *see also id.* ¶ 2 (quoting Carney Deposition at pp. 26:6-27:2 ("[Kenney] sent his loans to Atlantic Capital or he always had a tie-in with somebody for his loans.")).

Brickman then solicited a mortgage loan application from Plaintiff, obtained copies of her credit report, and obtained an appraisal of the Condo.  Def. UTS' Stmt., Docket No. [170], ¶ 21. It appears from the record that Kenney played some role in this process, although the exact extent is unclear; at a minimum, there is evidence that Kenney assisted Plaintiff with her application to Atlantic Capital.  *See* Pl.'s Resp. ¶ 5, Docket No. [190], (quoting Juergens Deposition at pp. 241:12-242:17 (testifying that Kenney assisted Plaintiff with the application to Atlantic Capital) and at p. 172:3-10 ("I recall Bill Kenney applying to Atlantic and a friend of his, Bob Brickman, but I don't know that I specifically filled out an application.  I think they might have done it for me because they were scrambling around to different places trying to get me a loan.")). Ultimately, despite multiple attempts to obtain a loan through public mortgage companies, Plaintiff's credit was so poor that Brickman was unable to obtain a home mortgage loan for Plaintiff.  Def. UTS' Stmt., Docket No. [170], ¶ 22.

Both Plaintiff and UTS agree that, at this point, Plaintiff's loan file was transferred to Carney, who was eventually responsible for contacting Owen and securing the loan from the Owen Living Trust.  The parties disagree, however, as to whether Kenney played any role in referring the matter to Carney and whether Carney was acting on behalf of UTS in securing the loan.  According to UTS, when Brickman realized he was unable to obtain a traditional mortgage loan for Plaintiff, given her poor credit history, he transferred Plaintiff's loan file to Carney because he "knew that Carney was an attorney whose clients included private lenders and

6

believed that Carney may have a private lender who would be willing to make a loan to [Plaintiff]." *Id.* ¶¶ 24-25; *see also* Def. UTS' [170] Opp'n/Cross-MSJ, Ex. A (Declaration of Robert Brickman) (hereinafter "Brickman Decl.") ¶ 17.  By contrast, Plaintiff contends that it was actually Kenney (an undisputed agent of UTS) who transferred the file to Carney and asked him if he could try to locate a potential lender for Plaintiff.  *See* Pl.'s Resp. ¶ 2, Docket No. [190].  In support of this assertion, Plaintiff directs the Court to an excerpted citation from Carney's deposition testimony in which he states that Kenney gave him Plaintiff's loan file and asked him "to see[] if any of [his] clients would be interested in making a loan . . . to [Plaintiff]." *Id.* (quoting Carney Deposition at p. 11:9-16); *see also id.* (quoting Carney Deposition at pp. 12:2-13:8 ("Bill Kenney came into my office and he brought a thick file and he gave me some pertinent information about the deal, that he had gone through one loan company – I think it was Atlantic Capital – and he just informed me to look it over and see if I might have a client that would be interested in making the loan, including myself."))._[4]_  The record before the Court thus reflects a dispute as to whether Brickman or Kenney actually provided Plaintiff's loan file to Carney and requested that he see if he could locate any interested lenders.

Both parties agree, however, that upon receipt of the Plaintiff's loan file, Carney reviewed it and eventually contacted Owen, a client of his legal practice, to ask him if he would be interested in making a loan to the Plaintiff.  Def. UTS' Stmt., Docket No. [170], ¶¶ 26, 28.

---

[4] Although UTS seeks to minimize this testimony by arguing that it demonstrates, at most, that Kenney acted as a "courier" who simply transferred Plaintiff's loan file from Atlantic Capital to Carney, a fair reading of Carney's cited deposition testimony in fact supports Plaintiff's position that Kenney not only brought Carney the file but also asked him to try and locate any interested private lenders.  Pl.'s Resp., Docket No. [190] ¶ 2 (quoting Carney Deposition at p.12:2-13:8).

7

Carney explained to Owen all the details of the property and the associated risks of the loan. *Id.* ¶ 29. Based that information, Owen ultimately agreed to extend a $60,000 loan to Plaintiff (hereinafter, the "Owen Loan"), with UTS acting as the closing agent for the loan. *Id.* ¶¶ 29-30. The terms of the Owen Loan required a monthly payment of $792.90 and a maturity date of October 20, 2004, at which time the principal was due in full. *Id.* ¶ 30.

According to UTS, its role as the closing agent for the Owen Loan was entirely separate from and independent of Carney's role in obtaining the loan from the Owen Living Trust, which UTS alleges that he undertook strictly within the confines of his outside, unrelated law practice on behalf of his private lender clients and not as an agent and/or employee of UTS. *See id.* ¶ 27. The evidence on the record, however, is mixed. First, Carney testified that neither he nor Owen had any conversations with Plaintiff about the Owen Loan—*i.e.*, that all communications about the Owen Loan flowed through Kenney, not Carney or Owen. Pl.'s Resp., Docket No. [190], ¶ 3. UTS admits that Kenney spoke with Plaintiff about the Owen Loan, although UTS contends that Kenney never actually spoke with Owen himself. Def. UTS' Resp., Docket No. [170], ¶ 3. It therefore appears that Carney was responsible for negotiating the terms of the loan with Owen, but that Kenney—and not Carney—was charged with communicating those terms to Plaintiff and securing her approval of the loan.

Second, although UTS contends that Carney's payment for his work on the Owen Loan was entirely separate from and independent of the payment to UTS for its settlement work—a fact that would, of course, support UTS' position that Carney's work on the loan was separate from his work with UTS—the evidence on this point is contradictory. The parties largely agree that both UTS and Carney received payment for their services from the proceeds of the Owen

8

Loan, but they disagree as to the precise details of those payments. UTS asserts that it received $6,223.00 from the Owen Loan proceeds in exchange for its work as the settlement agent, and that Carney was separately paid $2,500.00 for the legal work performed on behalf of his client, Mr. Owen. *Id.* ¶¶ 32-33. As support, UTS directs the Court's attention to the Owen Loan HUD-1 Settlement Statement, which lists the various payments paid to the relevant parties as part of the loan closing. *See* Fourth Am. Compl., Ex. 1 (a copy of the HUD-1 for the Owen Loan) (hereinafter "HUD-1"). The HUD-1 itself, however, is ambiguous, as it indicates only that the $2,500.00 payment for attorneys' fees was paid to "Robert Carney/UTS," and does not specify whether this money was paid directly to Robert Carney or to UTS. *See* HUD-1. In addition, although UTS also directs the Court to testimony from both Kenney and Carney, in which they confirm that Carney was ultimately paid $2,500.00 for his work on the Owen Loan, *see* Def. UTS' Stmt., Docket No. [170], ¶ 33, Carney explicitly testified that this was how much "[he] was charging [UTS] for all the work he performed surrounding this loan," Def. UTS' [170] Opp'n/Cross-MSJ, Ex C (Excerpts of Carney Deposition) at 24:5-9. Carney's testimony contradicts UTS' position that UTS' and Carney's payments for the work on the Owen Loan were entirely separate.

    B.    *Procedural Background*

Plaintiff filed her Fourth Amended Complaint in the above-captioned civil action on October 7, 2008. *See* Fourth Am. Compl., Docket No. [120]. Plaintiff sets forth 38 causes of action against the Defendants in this matter, 13 of which relate to Defendant UTS. *See generally id.* Discovery in this case is now closed, and the parties have each filed a series of dispositive motions on many of Plaintiff's allegations in her Fourth Amended Complaint, as well as on the

various counterclaims asserted by the Defendants in this action. For clarity's sake, the Court addresses herein only those motions for partial summary judgment filed by Plaintiff with respect to allegations in her Fourth Amended Complaint relating to the first loan—*i.e.*, the loan extended with the assistance of UTS—and Defendant UTS' related cross-motion for partial summary judgment: (1) Plaintiff's [156] Motion for Summary Judgment on the Issue of UTS's Conversion, (2) Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10), and (3) Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI. The first motion relates to Count II of Plaintiff's Fourth Amended Complaint while the latter two motions relate to Counts X and XI of Plaintiff's Fourth Amended Complaint. All other pending dispositive motions shall be addressed by separate order.

## II.  LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and

admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III.  DISCUSSION

The Court shall turn first to consider Plaintiff's [156] Motion for Summary Judgment on the Issue of UTS's Conversion, which relates to Count II of Plaintiff's Fourth Amended Complaint.  The Court shall then address Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10), and Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI.

> A.  *Plaintiff's Motion for Summary Judgment on the Issue of UTS' Conversion*

First, Plaintiff has moved for summary judgment as to Count II of her Fourth Amended Complaint alleging that UTS unlawfully retained a portion of Plaintiff's settlement proceeds from the UTS loan.  *See* Pl.'s MSJ, Docket No. [156].  Shortly after Plaintiff filed her motion but before UTS filed any response, Plaintiff and UTS jointly filed a [165] Stipulation of Dismissal, advising the Court that UTS has admitted liability with respect to Count II (conversion).  The parties therefore contemplate a trial with respect to Count II only as to damages.  *See* Stip. of Dismissal, Docket No. [165] at 2.  In light of this stipulation by Plaintiff and UTS, Plaintiff's [156] Motion for Summary Judgment on the Issue of UTS' Conversion is DENIED as moot.

> B.  *Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10) and Defendant UTS' [172] Cross-Motion for Summary Judgment as to Counts X and XI*

Plaintiff has also moved for summary judgment on the issue of whether UTS acted as a statutory mortgage broker as defined under D.C. Code § 26-1101(10).  *See* Pl.'s MSJ, Docket No. [157].  As is clear upon review of Plaintiff's Fourth Amended Complaint, the question of UTS' status as a statutory mortgage broker is directly relevant to two of Plaintiff's claims against UTS: (1) Count X (Violation of the D.C. Home Loan Protection Act); and (2) Count XI

(Violation of the D.C. Mortgage Lender Broker Act).  Specifically, the parties agree that, in order for Plaintiff to succeed on either claim, she must first show that UTS acted as a statutory "mortgage broker" in its dealings with Plaintiff, as that term is defined under D.C. Code § 26-1101(10).[5]  UTS opposes Plaintiff's motion, and has filed both an opposition to Plaintiff's motion as well as a cross-motion for summary judgment.  *See* Def. UTS' Opp'n/Cross-MSJ, Docket No. [170].  Unlike Plaintiff, UTS has moved for summary judgment not only as to the question of whether it acted as a statutory "mortgage broker," but also with respect to the substantive allegations asserted in Counts X and XI of Plaintiff's Fourth Amended Complaint.  *See generally id.*

Plaintiff timely filed a consolidated opposition to Defendant UTS' cross-motion and reply in support of her own motion.  *See* Pl.'s Opp'n/Reply, Docket No. [190].  In so doing, Plaintiff advised the Court that she is withdrawing Count XI of her Fourth Amended Complaint, in which Plaintiff alleges that UTS violated the D.C. Mortgage Lender Broker Act.  *Id.* at 21, n. 22; *see also* Stip. of Dismissal of Count XI, Docket No. [218] (stipulating that Plaintiff withdraws and dismisses with prejudice Count XI of her Fourth Amended Complaint).  Accordingly, Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI is DENIED as moot with respect to Count XI.  The only issues that remain with respect to the parties' cross-motions are whether UTS acted as a statutory mortgage broker and whether UTS violated the D.C. Home Loan Protection Act, DC. Code § 26-1151.01 *et seq*. ("HLPA"), as asserted in Count X.  As UTS

---

[5] The Court notes that Plaintiff has moved for summary judgment only as to the underlying issue of whether UTS has acted as a statuory mortgage broker pursuant to D.C. Code § 26-1101(10).  She has not moved for summary judgment on the ultimate question of whether, assuming UTS did act as a statutory "mortgage broker," it violated the substantive provisions of these statutes as alleged in Counts X and XI of the Fourth Amended Complaint.

has since filed its reply, *see* Def. UTS' Reply, Docket No. [220], the parties' cross-motions with respect to these two issues are now fully briefed and ripe for the Court's review.

As is demonstrated from the discussion above, *see supra* at pp. 3-9, it is readily apparent that substantial factual disputes exist in this case.  The Court must therefore consider whether, in light of the relevant legal framework that must be applied in this case, the factual disputes outlined above are material to resolution of Plaintiff's claims, such that summary judgment is inappropriate at this stage.  Here, Plaintiff contends that UTS acted as a statutory mortgage broker, pursuant to D.C. Code § 26-1101(10), in its dealings with Plaintiff and that, as a statutory mortgage broker, UTS is therefore liable for violations under HLPA.  In relevant part, section 26-1101(10) of the D.C. Code defines a "mortgage broker," as

> any person who, for compensation or gain, or in the expectation of compensation or gain, either directly or indirectly accepts or offers to accept an application for a mortgage loan, solicits or offers to solicit a mortgage loan on behalf of a borrower, or negotiates or offers to negotiate the terms and conditions of a mortgage loan on behalf of a lender.

Unfortunately, neither party has directed the Court to any case law discussing or applying this statutory definition nor has either party proffered any case law or other legal support indicating how the various terms in the statute should be construed.  Absent a more detailed discussion of this statutory provision by the parties—a provision that, on its face, appears to adopt a very liberal definition of who qualifies as a "mortgage broker"—the Court is not in a position to delineate the exact contours of the statute's reach.

Nonetheless, it is readily apparent that—regardless of the precise scope of the statutory definition quoted above—the determination of whether UTS acted as a statutory mortgage broker in its dealing with Plaintiff is dependent upon its specific conduct in this case.  As discussed above, however, genuine disputes exist as to UTS' conduct and role in soliciting the Owen Loan.

On the one hand, UTS contends that it acted solely as a settlement agent with respect to the Owen Loan and had no involvement in soliciting the loan from the Owen Living Trust; although UTS admits that one of its own partners, Carney, was ultimately responsible for negotiating the loan terms, UTS asserts that he did so strictly at the request of Atlantic Capital and acted entirely in his capacity as a private lawyer—not as an agent or partner of UTS. On the other hand, Plaintiff alleges that UTS was the main driving force behind efforts to secure Plaintiff's mortgage loan and that Carney, in negotiating with the Owen Living Trust, was acting on behalf of UTS, having been requested by Kenney to solicit a private mortgage loan for Plaintiff. Plaintiff and UTS have each introduced conflicting evidence as to these issues. Given that UTS' status as a mortgage broker is dependent upon the exact extent of its conduct in this case—an issue which cannot be resolved at this stage in the litigation—the Court concludes that genuine disputes of material fact preclude summary judgment on the record now before the Court. Accordingly, Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10) is DENIED, and Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI is DENIED, insofar as UTS argues that it did not act as a statutory mortgage broker in its dealings with Plaintiff.

      Nonetheless, UTS asserts that it is entitled to summary judgment on the larger question of whether it violated HLPA as alleged in Count X of Plaintiff's Fourth Amended Complaint because, even assuming it acted as a statutory mortgage broker in this instance, there is no evidence supporting Plaintiff's allegations with respect to HLPA. In Count X of her Fourth Amended Complaint, Plaintiff alleges that UTS violated the HLPA by, *inter alia*, extending the Owen Loan to Plaintiff even though she could not have been reasonably expected to make the scheduled payments, as required under D.C. Code § 26-1152.02(a). UTS has moved for summary judgment as to this allegation, asserting that it was reasonable for the lender in this case

to conclude that Plaintiff could be expected to make the scheduled payments on the Owen Loan.[6] *See* UTS' [170] Opp'n/Cross-MSJ at 7-8; UTS' [220] Reply at 8-10.  Plaintiff opposes UTS' motion, arguing that, "while Mary Juergens clearly had the ability to make the regular $792.90 monthly payments on the loan out of her $5,500.00 monthly stipend from Mr. Yearly," it was unreasonable to expect Plaintiff to be able to pay off the balloon payment in its entirety, either in cash or through refinancing.  Pl.'s [190] Opp'n/Reply at 14-25.  Given Plaintiff's concession that she could have reasonably been expected to make the monthly loan payments, the only issue now before the Court is whether Plaintiff reasonably could have been expected to make the balloon payment.

The HLPA provides that "[a] lender shall not make a covered loan if the borrower, at the time that the covered loan is closed, cannot reasonably be expected to make the scheduled payments."  D.C. Code § 26-1152.02(a).  The statute specifies various factors that a lender[7] may consider in making that determination.  *See generally id.*  For example, the statute provides that a lender may consider "the current and expected income, current obligations, and other financial resources of the borrower (other than the borrower's equity in the dwelling which secures repayment of the loan)."  *Id.* § 26-1152.02(a)(1).  In addition, as is particularly relevant to the

---

[6] Plaintiff, in Count X of the Fourth Amended Complaint, alleges that UTS violated the HLPA in multiple ways, including, for example, by unlawfully considering Plaintiff's equity in the Condo; by failing to inform Plaintiff of her right to obtain counseling; by failing to send Plaintiff a "Red Flag Warning Disclosure Notice," etc.  *See* Fourth Am. Compl. ¶¶263-271.  The Court notes that UTS has not addressed any of these additional allegations in its motion for summary judgment.  Rather, UTS has focused solely on the allegation that it violated the HLPA by extending the Owen Loan to Plaintiff even though she could not have been reasonably expected to make the payments.  Thus, although UTS purports to move for summary judgment as to the entirety of Count X, it is clear that UTS has in fact moved only as to one of the various allegations asserted by Plaintiff in Count X of the Fourth Amended Complaint.

[7] For purposes of HLPA, a "lender" is defined to include a "mortgage broker," as that term is used in D.C. Code § 26-1101(10).  *See* D.C. Code §§ 1151.01(11) and (13).

parties' arguments, the statute also provides that "the lender's determination of the ability of the borrowers to make an expected balloon payment at the scheduled maturity date may include consideration of the borrowers' equity interest in the residential real property and the borrowers' ability, based on current market conditions, to refinance the covered loan without penalty, hardship, or material loss of equity." *Id.* § 26-1152.02(a)(3).

UTS argues that, even assuming it qualifies as a lender under the HLPA, it is nonetheless entitled to summary judgment because (a) HLPA explicitly states that a lender may consider a borrowers' ability to refinance in determining the ability of a borrower to make an expected balloon payment, and (b) "it was reasonable for the lender to believe that, if Ms. Juergens were able to establish a good payment record on the Owen Loan, she would be able to refinance at the end of the year 'without penalty, hardship, or material loss of equity.'" UTS' [170] Opp'n/Cross-MSJ at 8; *see also* UTS' [220] Reply at 9. Significantly, however, UTS has not presented any factual or legal support for this assertion. Rather, UTS simply contends—without support—that it would have been reasonable to assume that Plaintiff could have obtained refinancing given her equity in the condominium unit and the assumption that Plaintiff's credit rating would have improved after a year of timely payments on the Owen Loan. UTS, as the moving party, bears the burden of demonstrating that it is entitled to summary judgment. Absent any evidentiary or legal support that such a determination was, in fact, reasonable, the Court is not in a position to find that, as a matter of law, it was reasonable for a lender to conclude that Plaintiff could have obtained refinancing under these specific conditions. The question is one better reserved for the jury. Accordingly, Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI is DENIED insofar as UTS seeks a ruling that it did not violate HLPA as alleged in Count X of the Fourth Amended Complaint.[8]

---

[8] The Court notes that UTS advances, for the *first* time in its Reply, the argument that it is entitled to summary judgment because the applicable statutory provisions of HLPA (*i.e.*, section

## IV.  CONCLUSION

For the reasons set forth above, the Court shall DENY Plaintiff's [156] Motion for Summary Judgment on the Issue of UTS's Conversion, Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10), and Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI.  Specifically, the Court:

- DENIES as moot Plaintiff's [156] Motion for Summary Judgment on the Issue of UTS' Conversion in light of the parties' joint stipulation and UTS' concession of liability;
- DENIES Plaintiff's [157] Motion for Summary Judgment on the Issue of Whether UTS Acted as a Mortgage Broker Pursuant to D.C. Code § 26-1101(10) and Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI, insofar as it moves for summary judgment on the issue of UTS' status as a statutory mortgage broker, based upon the existence of material disputes of fact;
- DENIES as moot Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI, insofar as it moves for summary judgment with respect to Count

---

26.1152.02(a)) do not apply in this case.  *See* UTS' [220] Reply at 6.  Specifically, UTS asserts that Plaintiff's gross income, as reported on the loan application, exceeded 120% of the median family at the time the application was received, and therefore, pursuant to D.C. Code § 26.1152.02(b), Plaintiff's loan application was not subject to the relevant HLPA provisions.  *See id.*  Although this argument appears to have merit, UTS did not include this assertion in its opening brief, and the Court therefore does not have the benefit of a response from Plaintiff.  Accordingly, the Court declines to consider this argument at this time in deciding UTS' motion for summary judgment.  *See Am. Wildlands v. Kempthorne,* No. 07-5179, 2008 WL 2651091, at *8 (D.C. Cir. July 8, 2008) ("We need not consider this argument because plaintiffs . . . raised it for the first time in their reply brief."); *McBride v. Merrell Dow & Pharm.,* 800 F.2d 1208, 1211 (D.C. Cir.1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to an appellee, but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered.") (internal citation omitted).

XI, in light of Plaintiff's stipulation of dismissal; and

- DENIES Defendant UTS' [170] Cross-Motion for Summary Judgment as to Counts X and XI, insofar as it moves for summary judgment with respect to Count X, based upon the existence of material disputed facts.

An appropriate Order accompanies this Memorandum Opinion.

Date:   September 14, 2009

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge
